CLERK'S OFFICE U.S. DIST. COURT
AT BIG STONE GAP, VA
FILED

MAR 0 8 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | |
|---|---|
| ERIC D. MULLINS, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 2:05cv00069 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| MICHAEL J. ASTRUE, ) | By: GLEN M. WILLIAMS |
| Commissioner of Social Security,[1] ) | SENIOR UNITED STATES DISTRICT |
| ) | JUDGE |
| Defendant. ) | |

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Eric D. Mullins, ("Mullins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Mullins's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed his current applications for DIB and SSI on or about October 16, 2002, alleging disability as of June 1, 2002, due to trauma to his legs, lungs and bone structure, as well as stomach bleeding, arthritis, ankle weakness, anxiety and depression. (Record, ("R"), at 15-16, 52-58, 62, 473-74.) The claims were denied initially and upon reconsideration. (R. 34-36, 477-79.) Mullins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 43.) The ALJ held hearings on April 29, 2004, and September 9, 2004, at which Mullins was represented by counsel. (R. at 486-503, 504-24.) On September 20, 2004, the ALJ issued a decision explaining his findings as to Mullins's claim. (R. at 15-21.)

By opinion dated September 20, 2004, the ALJ denied Mullins's claim. (R. at 15-21.) The ALJ found that Mullins met the disability insured status requirements of the Act for disability purposes on June 1, 2002, the date he alleged that he became

-2-

unable to work, through the date of the ALJ's decision. (R. at 20.) The ALJ found that Mullins had not engaged in substantial activity since June 1, 2002. (R. at 20.) In addition, the ALJ found that Mullins suffered from musculoskeletal impairments and a seizure disorder, which were considered severe impairments pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. at 20.) However, the ALJ determined that Mullins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) Furthermore, the ALJ found that Mullins's statements pertaining to his allegations of disabling pain and other symptoms were not credible and not supported by the documentary evidence. (R. at 20.) The ALJ also found that Mullins possessed the residual functional capacity to perform light work[2] that did not involve walking and/or standing more than two hours in an eight-hour day, repetitive squatting, kneeling or crawling, work at unprotected heights, operation of dangerous machinery and highly skilled, high stress jobs. (R. at 20.) Therefore, the ALJ found that Mullins was not capable of performing his past relevant work as a coal miner and fast food cook. (R. at 20.) Based upon Mullins's age, education and past work experience, as well as the testimony of vocational experts, the ALJ found that there were other jobs existing in significant numbers in the national economy that Mullins was capable of performing, including factory jobs such as a hand packer, an assembler, a checker, an examiner and a sorter. (R. at 21.) Thus, the ALJ concluded that Mullins was not under a disability as defined under the Act and was not entitled to benefits. (R. at 21.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

Case 2:05-cv-00069-GMW-PMS Document 12 Filed 03/08/07 Page 3 of 34 Pageid#: 68

After the ALJ issued his decision, Mullins pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 11.) The Appeals Council found no reason under the rules to review the ALJ's decision and denied Mullins's request for review; thereby, making the ALJ's decision the final decision of the Commissioner. (R. at 7-9.) *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). Thereafter, Mullins filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on Mullins's motion for summary judgment, (Docket Item No. 8), filed May 1, 2006, and on the Commissioner's motion for summary judgment, (Docket Item No. 10), filed June 1, 2006.

## II. Facts

Mullins was born in 1973, which classifies him as a "younger individual" under 20 C.F.R. §§ 404.1563(c), 416.963(c). (R. at 53, 473.) According to the record, Mullins received nine years of formal education, including some vocational training, which qualifies as having a "limited education" under 20 C.F.R. §§ 404.1564(b)(4), 416.964 (b)(4). (R. at 112-17, 489, 512.) Mullins has past relevant work experience as a general inside coal miner and as a fast food cook. (R. at 63.)

At a hearing before the ALJ on April 29, 2004, Mullins indicated that he was involved in an automobile accident in 1989 where he sustained significant injuries to his ankles, knees, ribs, lungs, arms, shoulders and heart. (R. at 490-91.) Mullins explained that he has endured 10 operations to his left leg. (R. at 491.) He testified further that, as a result of these injuries, he is unable to squat or stoop due to the excruciating pain it causes. (R. at 491.) Mullins also stated that his nerves were

-4-

"very bad." (R. at 492.) He explained that he had been diagnosed with panic attacks. (R. at 492.) Mullins claimed that he experienced these attacks "sometimes two to three times a week," with accompanying symptoms of his heart racing, pressure on his chest and shortness of breath. (R. at 492-93.) Mullins also testified that he has experienced depression and crying spells "for years." (R. at 493.) He indicated that, due to his pain, he stays in his house and is unable to participate in activities that he used to enjoy. (R. at 493.)

Mullins testified that he sleeps approximately three to four hours per night. (R. at 494.) He explained that he lives with his mother and that she prepares all of his meals and also sees that all household chores are completed. (R. at 494.) When asked what he does during the day, Mullins stated that "I just stay in the house and sit down and when my back starts hurting[, I] stand up, walk around for five, ten minutes. My leg starts hurting so I sit back down and then lay down. I just basically stay in the house." (R. at 494.) Mullins further testified that he could sit for only approximately 10 to 15 minutes before his leg begins to hurt. (R. at 494.) Mullins also was asked how much weight he could lift and carry at one time. (R. at 495.) Mullins explained that lifting a gallon jug of milk puts a strain on his back and legs and that he cannot hold it for a long period of time. (R. at 495.)

Mullins was asked if he received counseling or mental health therapy. (R. at 495.) Mullins testified that the only counseling he had received had been from a general practitioner doctor. (R. at 495.) Mullins also commented that he is seizure prone, and that, at the time of the April hearing, he had experienced three seizures, which had caused loss of consciousness. (R. at 496.) However, Mullins noted that

he had not experienced any further difficulties since being prescribed medications to control the seizures. (R. at 497.)

Additionally, the ALJ asked Mullins whether or not he had received training in welding. (R. at 497.) Mullins responded affirmatively, but explained that, due the pain in his legs and back, he could not handle that type of work. (R. at 497.) The ALJ also questioned Mullins as to his use of nonprescription drugs. (R. at 497.) Initially, Mullins testified that he did not use marijuana. (R. at 498.) However, he later admitted to using marijuana in the past to deal with his pain, and also acknowledged testing positive for marijuana in a drug screen conducted by a treating physician. (R. at 498.)

Robert Spangler, a vocational expert, testified that Mullins had past relevant work experience as a fast food cook and as a roof bolter. (R. at 499.) Spangler explained that Mullins's work as a fast food cook constituted medium,[3] semiskilled work, while his work in the coal mines qualified as heavy,[4] semiskilled work. (R. at 499.) In posing a hypothetical, the ALJ asked Spangler to consider a claimant of Mullins's age, education and past relevant work experience, who was restricted to light work and could not perform any squatting or crawling and who could not stand or walk for a prolonged period. (R. at 499.) The ALJ also explained that the

----

[3] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can do light work or sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

[4] Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, he can also perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2006).

-6-

individual would be limited to simple, low stress jobs that would not require him to work at unprotected heights or require him to operate dangerous equipment/machinery due to a history of seizure-type activity. (R. at 499.) Spangler testified that, based upon the ALJ's hypothetical, there were jobs within the national economy that such an individual could perform. (R. at 500.) Spangler noted that jobs such as a production machine tender and a nonconstruction laborer were available, which would allow a worker to sit or stand at will. (R. at 500.)

Spangler was then asked to consider the restrictions outlined in the first hypothetical, in addition to those restrictions set forth by B. Wayne Lanthorn, Ph.D., a licensed psychologist who examined Mullins. (R. at 500.) However, it appears that the page of the administrative record containing Spangler's response is missing. The ALJ closed the hearing, but left the record open so that Mullins could present additional medical records and information. (R. at 502.)

After reviewing the additional evidence that was provided by Mullins, the ALJ determined that it was necessary to have a supplemental hearing. (R. at 506.) A second hearing was held before the ALJ on September 9, 2004. (R. at 504-24.) At this hearing, Mullins testified that his condition had worsened. (R. at 507.) He explained that he had been hospitalized three times during 2004 because of problems with his left leg. (R. at 508.) Specifically, Mullins testified that he had experienced significant infections within the leg and that his doctors were considering amputation. (R. at 508.) Mullins also testified that his mental condition was terrible. (R. at 509.) He stated that he was continually depressed because of the possibility of losing his leg. (R. at 508.) He also stated that he did not like going anywhere and that he

-7-

continued to experience crying spells. (R. at 509.) Furthermore, Mullins testified that the pain he experienced was excruciating. (R. at 509.) The ALJ asked Mullins if he had received counseling or treatment for the depression and nervousness he had described, to which Mullins responded affirmatively. (R. at 510.) However, Mullins explained that he could not afford to continue with counseling. (R. at 511.) He stated that the doctors he had seen for counseling were primary care physicians. (R. at 511.) Mullins noted that he had been prescribed medication in the past for his nerves and/or depression. (R. at 511.)

Mullins also specifically stated that he was not enrolled in special education classes during his school years; instead, he commented that he was enrolled in vocational classes. (R. at 512.) Mullins testified that he had failed the third, fourth and fifth grades. (R. at 512.) He explained that he could read and write, but that he experienced difficulty when reading and attempting to understand certain newspaper articles. (R. at 512.)

Thomas Schacht, Psy.D., a medical expert, also testified at Mullins's second hearing. (R. at 513-19.) Schacht was asked to discuss Mullins's documented medical conditions that were identified within the record and to describe the severity of those conditions. (R. at 514.) Specifically, Schacht testified as to the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), which was administered by Lanthorn on April 6, 2004. (R. at 514.) Schacht noted that, based upon Mullins's full IQ score of 60, Lanthorn had determined that Mullins's score placed him at the bottom end of the mild range of mental retardation. (R. at 514.) Schacht also testified that Lanthorn had reported that the scores were valid, the result of good

-8-

effort and that the results represented a life-long condition. (R. at 514.) However, Schacht opined that Lanthorn's opinion was not consistent with the remainder of the record. (R. at 514.) Schacht explained that, based upon Mullins's school records, his achievement test scores were comparable to a higher IQ score than what Mullins received from Lanthorn. (R. at 514.) Schacht also noted that although Mullins testified that he had failed three grade levels, his transcript showed that he only failed the seventh grade. (R. at 514.) Furthermore, Schacht stated that Mullins's achievement test scores suggested that Mullins's reasons for academic failure was due to behavioral issues, not intellectual issues. (R. at 514.)

Schacht also testified regarding the injuries Mullins sustained in the automobile accident. (R. at 514-15.) He stated that Lanthorn reported that Mullins suffered a "bruised brain" in the accident; however, Schacht explained that the medical records did not indicate a loss of consciousness and that the hospital discharge did not acknowledge a brain injury. (R. at 515.) It also was noted that a neurological examination was within normal limits. (R. at 515.) Schacht opined that Mullins's prior work as a roof bolter in the coal mines required a higher IQ score than 60, thus, that occupation was not consistent with Mullins's score as documented by Lanthorn. (R. at 515.) Schacht also referenced a report from Frontier Health from July 2003, which listed Mullins's intelligence as average or above. (R. at 515.)

Additionally, Schacht explained that evidence within the record demonstrated that Mullins has had problems with substance abuse. (R. at 515.) He noted that a urine screen taken at the time of the 1989 automobile accident revealed that Mullins

-9-

had tested positive for marijuana and benzodiazepines.[5] (R. at 515.) Schacht further explained that Mullins had tested positive on other occasions and that a notation was made on a lab sheet indicating that Mullins's pill count was irregular. (R. at 516.) Due to failing these drug screenings, Mullins's doctor dismissed him from a pain management program. (R. at 516.) Schacht also explained that another doctor refused to prescribe narcotics to Mullins until he provided the doctor with his medical history and narcotics treatment history. (R. at 516.) Schacht indicated that Mullins never produced the requested documentation. (R. at 516.)

Schacht noted that there was no evidence within the record that demonstrated that Mullins had difficulties with impulse control, other than the fact that he was required to attend anger management counseling because of domestic issues. (R. at 517.) Schacht stated that if Mullins's IQ score of 60, as reported by Lanthorn, was accepted, then Mullins would meet the impairments listing for mental retardation. (R. at 518.) Thus, based upon the questionable scores, which Schacht opined were likely the result of malingering, and other inconsistencies in the record, Schacht stated that it would be reasonable to look very carefully at the credibility and accuracy of Lanthorn's diagnoses. (R. at 517.)

Norman Hankins, a vocational expert, also testified at the second hearing. (R. at 520.) Hankins testified that Mullins's work as a roof bolter in the coal mines was classified as semiskilled work that required medium exertion. (R. at 521.) He also explained that Mullins's work as a fast food cook was considered to be unskilled

---

[5] Schacht explained that benzodiazepines include medications such as Valium, Xanax, Klonopin or Ativan. (R. at 515.)

work that required light exertion. (R. at 521.) The ALJ posed a hypothetical to Hankins and asked him to consider an individual of Mullins's same age and educational background, that was restricted to light work activity and could not stand or walk for more than two hours in an eight-hour workday, could not squat or crawl and could not work at unprotected heights or operate dangerous machinery. (R. at 521.) In addition, Hankins was asked to assume that this individual could perform only simple, low stress jobs. (R. at 521.) Hankins stated that there were jobs within the national economy that Mullins could perform. (R. at 522.) Specifically, Hankins opined that a person with Mullins's educational background and abilities would be able to perform factory jobs such as a hand packer, a small products assembler, a production checker, an examiner, a tester and a sorter. (R. at 522.) Hankins explained that each of the occupations above provide the employee with a sit or stand option. (R. at 522.)

Moreover, Hankins was asked to assume that, in addition to the facts in the first hypothetical, the individual would have no useful ability to carry out and remember detailed instructions, to make judgments on simple work-related decisions, to respond appropriately to changes in a work setting, to interact with supervisors and co-workers or to respond appropriately to work pressures or changes in routine. (R. at 522.) Hankins testified that, with these additional limitations, Mullins would be unable to perform the previously mentioned occupations. (R. at 522.)

In rendering his decision, the ALJ reviewed records from Dr. Robert T. Strang, M.D.; Holston Valley Medical Center; Dr. Mark Griffith, M.D.; Dr. S. Wilson, M.D.; Norton Community Hospital; Coeburn Communicare; Methodist Hospital of

-11-

Kentucky; Dr. Harold Schultz, D.O.; St. Mary's Hospital; Dr. Kevin Blackwell, D.O.; Stone Mountain Health Services; Frontier Health; B. Wayne Lanthorn, Ph.D., a licensed psychologist; Robert S. Spangler, a vocational expert; Norman Hankins, a vocational expert; Thomas Schacht, Psy.D., a medical expert; Dr. Shahab Ehtesham, M.D.; Dr. Julie Jennings, Ph.D., a state agency psychologist; Dr. Donald R. Williams, M.D., a state agency physician; and Dr. Robert O. McGuffin, M.D., a state agency physician.

Dr. Robert T. Strang, M.D., examined Mullins on March 10, 1987, following a motorcycle accident and discovered a knock-knee deformity in the right knee and a medial instability of the left knee due to a torn medial ligament. (R. at 120.) Dr. Strang noted that Mullins also may have experienced a torn anterior cruciate ligament. (R. at 120.) Following examinations on March 13, 1987, and March 17, 1987, Dr. Strang and Dr. Robert T. Strang, Jr., M.D., both suggested that Mullins have arthroscopic surgery of the knee, and also suggested that the proximal tibial epiphyses be stapled. (R. at 118-19.) Nearly two years later, on January 29, 1989, Mullins sustained significant injuries in an automobile accident, which required hospitalization at Holston Valley Medical Center until April 3, 1989. (R. at 123-257.) In this accident, Mullins suffered a right pneumothorax, pulmonary contusions, malleolar fracture and a left tibial fibular fracture. (R. at 126.) Mullins suffered no loss of consciousness, and his neurological examination was reported to be within normal limits. (R. at 123-24.)

Hospital records indicate that during Mullins's hospitalization he experienced "steady but slow progress." (R. at 125.) Mullins underwent several procedures while

-12-

hospitalized and no complications were reported. (R. at 126.) In addition, the discharge summary signed by Dr. Rex E. Luttrell, M.D., noted that Mullins's condition had improved upon discharge. (R. at 126.) On January 30, 1990, x-rays showed satisfactory healing of both the tibia and fibula and complete healing was noted. (R. at 265.) Furthermore, Mullins was cleared to engage in unlimited activities. (R. at 265.) Medical records also demonstrate that Mullins reported pain in his knees and right ankle, with stiffness in his left ankle and mild swelling on April 17, 1990. (R. at 265.) However, x-rays again indicated satisfactory healing. (R. at 265.) Mullins also was ordered to begin physical therapy for a period of six weeks. (R. at 265.)

It should be noted that following these two accidents, Mullins was employed for nearly 10 years in the coal mines and worked for approximately one year as a fast food cook. While employed as a general inside coal miner, Mullins reported several work-related injuries. On October 31, 1996, Mullins suffered an injury to his left foot when a piece of a belt structure fell on him while working at Sargent Hollow Mines. (R. at 275-78.) He presented to Norton Community Hospital with left foot pain and swelling. (R. at 275.) X-rays indicated no fracture or dislocation, with some degenerative change present at the tibiotalar joint, a slightly flattened talus with heterotopic bony formation around the ankle joint, which was secondary to old trauma. (R. at 278.) Mullins was diagnosed with a contusion of the left foot and was treated with pain control. (R. at 276.)

On April 24, 1998, Mullins presented to Norton Community Hospital following another work-related injury. (R. at 289.) Mullins suffered a left ankle injury after

-13-

falling in a hole while pulling cable at a coal mine. (R. at 289.) X-rays of the left ankle demonstrated degenerative change, with no definite acute fracture or dislocation. (R. at 293.) The attending physician diagnosed Mullins with a left ankle sprain, prescribing him Darvocet for the pain. (R. at 290.)

Mullins presented to Holtson Valley Medical Center with complaints of left knee and leg pain on the following dates: May 18, 1999, June 16, 1999, July 22, 2000, July 28, 1999, September 22, 1999, February 4, 2000, and February 24, 2000. (R. at 297-303, 400-03.) Mullins described his pain as "a constant aching, throbbing, deep, sharp pain." (R. at 301.) He also indicated that the majority of the time he would rate his pain as nine on a 10-point scale. (R. at 301.) Dr. Harland Simpson, M.D., speculated that Mullins suffered from neuropathic pain in his left knee along with arthritic pain from past injuries. (R. at 302.) He prescribed Mullins with Elavil and Oxycontin, and instructed Mullins to continue taking Paxil. (R. at 302.) Dr. Simpson noted that Mullins was to follow up in two weeks, at which point drug screening would be ordered. (R. at 302.) During the course of these visits, Mullins was prescribed Oxycontin on numerous occasions. (R. at 400-03.) However, on February 24, 2000, medical records indicate that Dr. Simpson explained that Mullins had violated the narcotics contract on multiple instances; thus, Dr. Simpson discontinued the narcotics prescriptions and instructed him to follow up with his primary care physician. (R. at 400.)

Mullins sought treatment from Dr. Harold Schultz, D.O., from August 2001 to March 2002. (R. at 320-26.) Mullins reported feelings of depression, headaches, nervousness, erectile dysfunction and pain in the arms, back, legs, neck and

-14-

shoulders. (R. at 325.) On August 10, 2001, a lab report indicated that Mullins had tested positive for benzodiazepines. (R. at 332.) Similarly, on January 7, 2002, Mullins tested positive for THC and amphetamines. (R. at 330.) A February 6, 2002, lab report showed a positive test for opiates. (R. at 329.) Dr. Schultz noted on February 6, 2002, that Mullins failed to report as planned with his pill count, and explained that if Mullins failed another urine screening, he would either have to seek counseling or be dismissed from the pain management program. (R. at 321.) On March 29, 2002, Mullins was dismissed from the pain management program. (R. at 328.)

Dr. Kevin Blackwell, D.O., performed a consultative examination upon Mullins on March 28, 2002. (R. at 348-55.) Based upon this examination, Dr. Blackwell concluded that Mullins would be restricted from squatting, kneeling and crawling. (R. at 351.) Dr. Blackwell also found that Mullins could lift a maximum of 50 pounds, 40 pounds infrequently and 30 pounds frequently. (R. at 351.) Dr. Blackwell noted no limitations as to the movement of Mullins's hands and found that Mullins was capable of sitting for eight hours during a typical eight-hour workday. (R. at 351.) Furthermore, he concluded that Mullins was capable of standing for four hours in a typical eight-hour workday, assuming normal positional changes as required by law. (R. at 351.)

On June 6, 2002, Mullins presented to Dr. Blackwell with complaints of left ankle pain. (R. at 343.) Mullins claimed that he injured the ankle while stepping out of a vehicle. (R. at 343.) The ankle was examined and no swelling or ecchymosis was noted. (R. at 343.) Dr. Blackwell diagnosed Mullins with a left ankle strain,

noted no significant abnormalities and advised him to return if his symptoms worsened. (R. at 343.) Dr. Blackwell also noted that Mullins likely would be able to return to regular work activities in one week. (R. at 343.)

On June 13, 2003, Mullins was admitted to Norton Community Hospital, and, upon admission, was diagnosed with cellulitis of the left leg and the possibility of deep venous thrombosis of the left leg. (R. at 356.) The medical records demonstrate that Mullins's admission was uncomplicated, as he was treated with antibiotics for cellulitis of the left leg. (R. at 356.) In addition, deep venous thrombosis of the left leg was ruled out after administering a venous doppler of the left extremity. (R. at 356.) Mullins was prescribed Keflex, an antibiotic, and Lortab. (R. at 356.) Mullins was discharged on June 16, 2003, and his condition was noted as improved. (R. at 356.)

A physical residual functional capacity assessment, ("PRFC"), was completed by Dr. Robert O. McGuffin, M.D., a state agency physician, on June 13, 2003. (R. at 370-77.) Dr. McGuffin found that Mullins was able to occasionally lift and/or carry items weighing 20 pounds and that he was capable of lifting items weighing 10 pounds frequently. (R. at 371.) In addition, Dr. McGuffin found that Mullins was able to stand and/or walk for a total of at least four hours in an eight-hour workday. (R. at 371.) Dr. McGuffin also noted that Mullins was capable of sitting for a total of about six hours in an eight-hour workday. (R. at 371.) Furthermore, Dr. McGuffin reported that Mullins's ability to push and/or pull with his lower extremities was limited, that he could never squat or climb, but that he could occasionally kneel, balance, crouch and crawl. (R. at 371-72.) Dr. McGuffin also concluded that Mullins

-16-

had no manipulative, visual, communicative or environmental limitations. (R. at 373-74.) Dr. McGuffin determined that Mullins's symptoms were partially credible. (R. at 375.) Dr. Donald R. Williams, M.D., a state agency physician, affirmed Dr. McGuffin's findings. (R. at 377.)

On June 16, 2003, Mullins presented to Holston Valley Medical Center and complained of pain and swelling in his left leg.[6] (R. at 378.) Mullins rated his pain a nine on a 10-point scale. (R. at 379.) Mullins was prescribed Lortab and Keflex. (R. at 379.)

Mullins sought treatment at Stone Mountain Health Services in St. Paul, Virginia, from July 8, 2003, to August 18, 2003. (R. at 380-85.) The records show that Mullins presented to Stone Mountain Health Services with complaints of chronic leg pain, which evolved from his previous ankle and knee injuries. (R. at 381.) The medical records also indicate that Stone Mountain Health Services refused to grant Mullins's request for certain pain medications because he failed to provide previous medical records. (R. at 380.) Dr. Candace Bellamy, M.D., noted that he informed her that he had been prescribed Lortab for years, and that he also had previously been prescribed Oxycontin and other strong pain medications. (R. at 381.) However, Dr. Bellamy explained that she could not proceed with treatment until he presented his previous medical records. (R. at 380.) Dr. Bellamy referred Mullins to the pain clinic in Duffield, Virginia, but again noted that the clinic would not be able to treat him until his other medical records were provided. (R. at 380.)

---

[6] The medical records from the June 16, 2003, emergency room visit are mostly illegible. (R. at 378-79.)

A Psychiatric Review Technique Form, ("PRTF"), was completed by Julie Jennings, Ph.D., a state agency psychologist, on October 16, 2003. (R. at 386-99.) Jennings found that Mullins had no medically determinable impairments. (R. at 386.) In Jennings's notes, she explained that Mullins was alert, cooperative and oriented, with a good mental status. (R. at 398.)

Between June 25, 2003, and November 25, 2003, Mullins received mental health services from Frontier Health. (R. at 404-19.) This treatment was not independently sought by Mullins; instead, this treatment was court-ordered. (R. at 415.) Medical records indicate that, due to domestic violence and intimidation of a witness charges, Mullins was ordered to serve two years of probation and also ordered to enroll in an anger management class. (R. at 418.) Mullins was diagnosed with impulse control disorder not otherwise specified. (R. at 415.) In Mullins's DSM-IV Assessment, his "[a]verage intelligence or above" was identified as one of his strengths. (R. at 410.) His low behavioral control was identified as one of his weaknesses. (R. at 410.) The medical records demonstrate that Mullins failed to complete required homework assignments and was informed that the course would not be satisfied until the assignments were completed. (R. at 404.) It is unclear from the record if the assignments were ever properly completed.

B. Wayne Lanthorn, Ph.D., a licensed psychologist employed by Mullins's attorney, administered the WAIS-III to Mullins on April 6, 2004. (R. at 421-27.) Mullins received a verbal IQ of 65, a performance IQ of 60 and a full-scale IQ of 60. (R. at 421.) Based upon these scores, Lanthorn explained that Mullins ranked in the extremely low average range of current intellectual functioning. (R. at 425.)

-18-

Lanthorn also noted that there was a clinically significant difference in the verbal IQ score and his performance IQ score. (R. at 425.) Lanthorn explained that this type of disparity is associated with individuals who are experiencing a high degree of anxiety, tension and depression. (R. at 425.)

Following Mullins's psychological evaluation, Lanthorn reported the following diagnoses: panic disorder without agoraphobia; major depressive disorder, recurrent, severe; pain disorder associated with both psychological factors and a general medical condition, chronic; and mild mental retardation. (R. at 426.) Lanthorn also noted that Mullins suffered from economic problems because of his limited educational skills, occupational problems because of his inability to resume his former employment and problems with his primary support group. (R. at 426.) Mullins was judged as being competent to manage his own funds. (R. at 426.) Lanthorn opined that Mullins suffered from severe limitations that impacted his overall adaptability skills. (R. at 427.) Lanthorn expressed a concern as to Mullins's overall psychological well-being and recommended that he seek psychological services. (R. at 427.)

Lanthorn also assessed Mullins's Global Assessment of Functioning,[7] ("GAF"), score at 40. (R. at 426.) Mullins was found to have a moderate impairment in his ability to understand, remember and to carry out short, simple instructions, to have

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication OR a major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." DSM-IV at 32.

extreme impairment in his ability to understand, remember and carry out detailed instructions and to make judgments on simple work-related decisions. (R. at 428.) He was also found to have a marked impairment in his ability to interact appropriately with the public, an extreme impairment in his ability to interact with supervisor(s), to interact with co-workers, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 429.)

On February 29, 2004, it appears that Mullins presented to Norton Community Hospital with complaints of pain in his left leg. (R. at 436.) This particular visit was classified as a nonemergency. (R. at 438.) Medical records indicate that there was concern that the pain could be the result of cellulitis.[8] (R. at 436.) Mullins was prescribed Ultracet for pain and also was prescribed an antibiotic. (R. at 437.)

On March 9, 2004, Mullins again presented to Norton Community Hospital after suffering from a seizure. (R. at 440.) As a result of the seizure, Mullins experienced a right proximal humerus fracture dislocation. (R. at 440.) Mullins underwent a closed reduction of the right shoulder under anesthesia. (R. at 441.) Mullins also underwent a CT scan of the brain, which was negative for epidural, subdural or intracerebral hemorrhage. (R. at 450.) The medical records also refer to Mullins's previous left leg injuries; however, the records indicate that, at the time of the seizure, his left leg injury was stable. (R. at 446.) Mullins was discharged from Norton Community Hospital on March 10, 2004. (R. at 440.)

---

[8] The medical records from this visit are mostly illegible. (R. at 436-37.)

On April 23, 2004, Mullins was examined by Dr. Shahab M. Ehtesham, M.D., and complained of feelings of anxiousness. (R. at 431.) Dr. Ehtesham noted that Mullins suffered from anxiety syndrome, which he attributed to a 2003 divorce. (R. at 432.) Dr. Ehtesham also noted that Mullins experienced pain in his lower extremities, which resulted from injuries sustained in a car accident. (R. at 432.) Medical records also indicate that Mullins complained of difficulty in concentration, which he claimed had been occurring for the past several years. (R. at 432.) Dr. Ehtesham prescribed Mullins with Xanax and Klonopin, and he was instructed to continue taking Dilantin. (R. at 432.) In addition, Dr. Ehtesham noted that narcotics shall not be prescribed. (R. at 432.)

On May 25, 2004, Mullins again sought treatment from Dr. Ehtesham and complained of anxiety and nervousness. (R. at 451.) Dr. Ehtesham's medical records indicate that Mullins's extremities were nontender, with a full range of motion and no pedal edema. (R. at 452.) Mullins informed Dr. Ehtesham that he had stopped taking both Klonopin and Gabatril, which had been prescribed to him. (R. 451.) Mullins asked that Dr. Ehtesham prescribe him Xanax; however, Dr. Ehtesham informed Mullins that Xanax was not appropriate. (R. at 452.) Dr. Ehtesham prescribed Mullins Paxil for his complaints of anxiety. (R. at 452.)

Mullins presented to Norton Community Hospital on June 23, 2004, with complaints of left knee pain, redness and swelling. (R. at 453.) The attending physician in the emergency room noted a concern about possible knee joint infection. (R. at 453.) The attending physician attempted to aspirate the knee joint and managed to remove a small portion of bloody material. (R. at 453.) Dr. Danny A. Mullins,

-21-

M.D., opined that he did not think that Mullins had an intraarticular infection. (R. at 454.) Dr. Mullins noted that he had treated Mullins in the past, and that Mullins had a history of frequent visits to the emergency room. (R. at 454.) Dr. Mullins attempted to aspirate the bursal area of the left knee, but did not remove any fluid. (R. at 454.) Dr. Mullins reported that Mullins had slight erythema and slight puffiness as compared to the other leg. (R. at 454.) In addition, Dr. Mullins indicated that he suspected the early stages of bursitis that could lead to infections; thus, he noted that he would give Mullins the benefit of the doubt and admit him for observation. (R. at 454.)

Dr. Mullins ordered intravenous Ancef, pain medication, anti-inflammatories and icing of the knee. (R. at 455.) Dr. Mullins indicated that there was no evidence of any deep infection. (R. at 455.) An x-ray of the left knee showed soft tissue swelling anterior to the patella, a deformity of the proximal shaft of the tibia, a slight deformity at the proximal shaft of the fibula, which all were likely related to Mullins's prior injuries. (R. at 456.)

On August 23, 2004, Mullins again presented to Norton Community Hospital with complaints of left leg pain, groin pain, left leg numbness and flank pain. (R. at 464.) Mullins was admitted to the hospital where he was diagnosed with cellulitis and treated for five days with intravenous antibiotic treatment. (R. 461-72.) A venous doppler of the left lower extremity was administered on August 23, 2004, which found no evidence of deep venous thrombosis in the left lower extremity. (R. at 472.) However, the examination did show enlarged lymph nodes in the left inguinal region, which raised questions of underlying infections. (R. at 472.) An

-22-

MRI was performed on August 24, 2004, and found atrophy of the muscles of the posterior compartment of left leg and a subcutaneous edema at the posteromedial aspect of the middle and lower portions of the left leg with no definite evidence of osteomylelitis or abscess formation. (R. at 470.) Upon discharge, medical records indicate that Mullins improved tremendously due to treatment with intravenous antibiotics. (R. at 461.) In addition, at the time of discharge, Mullins no longer suffered from cellulitis, and it was noted that he remained medically stable during his entire hospitalization. (R. at 461.) Mullins was prescribed Augmentin and was scheduled for a follow-up appointment at Southwest Virginia Orthopedics. (R. at 461.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is

-23-

unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)–(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By opinion dated September 20, 2004, the ALJ denied Mullins's claim. (R. at 15-21.) The ALJ found that Mullins met the disability insured status requirements of the Act for disability purposes on June 1, 2002, the date he alleged that he became unable to work, through the date of the ALJ's decision. (R. at 20.) The ALJ found that Mullins had not engaged in substantial activity since June 1, 2002. (R. at 20.) In addition, the ALJ found that the medical evidence established that Mullins suffered from musculoskeletal impairments and a seizure disorder, which were considered severe impairments pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. at 20.) However, the ALJ determined that Mullins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) Furthermore, the ALJ found that Mullins's statements pertaining to his allegations of disabling pain and other symptoms were not credible and not supported by the documentary evidence. (R. at 20.) The ALJ also found that Mullins possessed the residual functional capacity to perform light work that did not involve walking and/or standing for more than two hours in an eight-hour workday, repetitive squatting, kneeling or crawling, work at unprotected

-24-

heights, operation of dangerous machinery and highly skilled, high stress jobs. (R. at 20.) Therefore, the ALJ found that Mullins was not capable of performing his past relevant work as a coal miner and fast food cook. (R. at 20.) Based upon Mullins's age, education and past work experience, as well as the testimony of a vocation expert, the ALJ found that there were other jobs existing within the national economy that Mullins was capable of performing, including factory jobs such as a hand packer, an assembler, a checker, an examiner and a sorter. (R. at 21.) Thus, the ALJ concluded that Mullins was not under a disability as defined under the Act and was not entitled to benefits. (R. at 21.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

Mullins argues that substantial evidence does not exist within the record to support the ALJ's decision. Specifically, Mullins first argues that the ALJ erred by failing to find that Mullins met or equaled the requirements in 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.05(C). (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 6-9.) Second, Mullins argues that the ALJ erred by improperly determining Mullins's residual functional capacity. (Plaintiff's Brief at 10-13.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings

and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger,* 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he or she has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano,* 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano,* 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Mullins's first argument is that the ALJ erred by failing to find that Mullins met or equaled the requirements in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C). (Plaintiff's Brief 6-9.) Mullins contends that Lanthorn's finding of mental retardation was supported by the facts in this case. (Plaintiff's Brief 7-9.) Under the regulations, mental retardation "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e. the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). A claimant is found to have met the requisite level of severity for this disorder if the claimant has "a valid verbal performance, or full scale IQ of 60 through 70 and a

-26-

physical or other mental impairment imposing an additional and significant work-related limitation or function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05(C).

Essentially, Mullins argues that the ALJ substituted his own views of the severity of Mullins's impairments for those of a trained professional. However, this argument is without merit. As the record clearly illustrates, the WAIS-III test administered by Lanthorn revealed a verbal IQ score of 65, a performance IQ score of 60 and a full-scale IQ score of 60. (R. at 421.) Based upon these scores, Lanthorn opined that Mullins ranked in the extremely low average range of current intellectual functioning. (R. at 425.) Lanthorn diagnosed Mullins with panic disorder without agoraphobia; major depressive disorder, recurrent, severe; pain disorder associated with both psychological factors and a general medical condition, chronic; and mild mental retardation. (R. at 426.)

In reviewing Lanthorn's evaluation, Thomas Schacht, Psy.D., a medical expert who testified at the second hearing before the ALJ, opined that Lanthorn's findings were not consistent with the remainder of the record. (R. at 514.) Specifically, Schacht concluded that, based upon Mullins's school records, his achievement test scores were comparable to a higher IQ score than what Mullins received from Lanthorn. (R. at 514.) In addition, Schacht stated that Mullins's academic failure in school was due to behavioral issues, not intellectual issues. (R. at 514.) Schacht also opined that Mullins's prior work as a roof bolter in the coal mines and his IQ score, as found by Lanthorn, were not consistent. (R. at 515.) Basically, Schacht was of the opinion that the ability to perform the occupational duties of a roof bolter in a coal mine required a higher IQ score than 60. Furthermore, medical records from Frontier

-27-

Health demonstrate that one of Mullins's strength was his "[a]verage intelligence or above." (R. at 410.) Similarly, an October 16, 2003, a PRTF performed by Julie Jennings indicated no medically determinable impairments and noted that Mullins was in good mental status. (R. at 386-99.)

Thus, it is readily apparent that the ALJ chose to reject Lanthorn's opinions and accept the opinions expressed by Schacht, as well as other relevant evidence within the record. Mullins argues that the ALJ may not substitute his views as to the severity of Mullins's psychiatric impairments for those of a trained professional. However, the ALJ did not substitute his personal views; instead, he accepted the views of a medical expert. In essence, the ALJ found that Schacht's opinion as to the inconsistencies in Lanthorn's findings were credible. In determining whether substantial evidence supports the Commissioner's decision, it is the duty of this court to see that the ALJ properly analyzed all the relevant evidence and whether the ALJ explained his findings and rationale for accepting certain evidence. *See Smokeless Coal Co.*, 131 F.3d at 439-40. Here, the ALJ did consider Lanthorn's opinions; however, the ALJ decided that the medical opinion of Schact was more convincing and supported by substantial evidence. Therefore, this court finds that the ALJ properly considered all of the relevant evidence and sufficiently explained his reasoning for accepting the opinion of Schacht and rejecting the opinion of Lanthorn.

It is evident that there is a conflict within the evidence presented by Lanthorn and in the evidence presented by Schacht. Nevertheless, it is the ALJ's duty, and not the duty of the courts, to make findings of fact and to resolve those conflicts in evidence. *See King*, 599 F.2d at 599. In this case, the ALJ's decision to reject

-28-

Lanthorn's findings was within his discretion, provided that his finding was supported by substantial evidence. Thus, based upon the detailed opinion of Schacht, as well as other relevant evidence within the record, there is substantial evidence to support the ALJ's findings.

Mullins also argues that the ALJ erred by improperly determining his residual functional capacity. Mullins argues that the ALJ afforded controlling weight to a nontreating physician's opinion. (Plaintiff's Brief at 10.) In this case, the ALJ found that Mullins possessed the residual functional capacity to perform light work that did not require walking and/or standing for more than two hours in an eight-hour workday, repetitive squatting, kneeling or crawling, work at unprotected heights, operation of dangerous machinery and highly skilled, high stress jobs. (R. at 20.) Thus, the ALJ determined that Mullins was not capable of performing his past relevant work. (R. at 20.) However, based upon testimony from a vocational expert, the ALJ found that there were other jobs existing within the national economy that Mullins was capable of performing despite the limitations imposed upon him. (R. at 21.)

Mullins contends that the ALJ cannot place controlling weight on a non-treating physician's opinion. As stated above, an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record support his findings. *See King*, 615 F.2d at 1020. If a treating source's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with other

-29-

substantial evidence, it is given controlling weight. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). However, the Fourth Circuit has noted that "circuit precedent does not require a treating physician's testimony 'be given controlling weight.'" *Craig v. Charter*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). If the opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. "[T]he testimony of a non-examining physician can be relied upon when it is consistent with the record." *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971)).

In this case, the evidence of certain nontreating physicians is consistent with the record. The ALJ's decision regarding Mullins's residual functional capacity was supported by the testimony of vocational experts Norman Hankins and Robert Spangler, the consultative examination records of Dr. Kevin Blackwell and the PRFC performed by Dr. Robert McGuffin, and affirmed by Dr. Donald R. Williams. In fact, the ALJ seems to have given Mullins the benefit of the doubt with regard to how long he is capable of walking and/or standing during a typical eight-hour workday. Dr. McGuffin opined that Mullins was capable of sitting for approximately six hours in an eight-hour workday. (R. at 371.) As previously mentioned, this finding was affirmed by Dr. Williams. (R. at 377.) Furthermore, in a consultative examination performed by Dr. Blackwell, a treating physician, it was found that Mullins was capable of standing for four hours in an eight-hour workday, assuming normal positional changes. (R. at 351.)

-30-

Although the ALJ found that Mullins was capable of walking and/or standing for no more than two hours in a typical workday, based upon significant supporting evidence within the record, the ALJ easily could have imposed a less severe limitations as to Mullins's capabilities by accepting the findings of Dr. McGuffin and Dr. Blackwell, who both opined that Mullins was capable of walking and/or standing for at least four hours in an eight-hour workday.

As mentioned earlier, the ALJ exercised his discretion in determining that Lanthorn's evaluations and diagnoses were not credible; partially due to malingering, but, also due to inconsistencies within other portions of the record. The ALJ chose to accept the medical opinion of Schacht, in conjunction with other relevant medical evidence and records. Mullins argues that Lanthorn's evaluations, coupled with the fact that a primary care physician prescribed him medication for anxiety and depression, amount to substantial evidence to demonstrate that Mullins is unable to perform any substantial gainful activity. (Plaintiff's Brief at 13.) However, as noted by the ALJ, Mullins's only treatment from a mental health source was by virtue of a court-ordered anger management class. Therefore, there is not sufficient evidence within the record to support the claim that Mullins's alleged depression and anxiety are severe. Likewise, Lanthorn's diagnoses of panic disorder without agoraphobia, major depressive disorder, pain disorder and mild mental retardation have been discredited because of possible malingering and the fact that the evaluations were inconsistent with other aspects of the record. Thus, Mullins's argument that the ALJ's finding regarding his residual functional capacity was unsupported by the substantial evidence within the record is erroneous.

-31-

It is clear that Mullins has experienced consistent difficulties with his left ankle and knee since the 1989 accident. These physical impairments obviously place limitations on Mullins's ability to perform certain activities. However, those limitations were considered within the ALJ's opinion, and the limitations considered were supported by medical evaluations. Moreover, vocational experts identified jobs that exist in significant numbers within the national economy that a person facing those limitations would be capable of performing. Thus, based upon the record, the ALJ's decision regarding Mullins's residual functional capacity is supported by substantial evidence.

It also should be noted that the ALJ has the authority to assess the credibility of a witness or a claimant. *See Hays*, 907 F.2d at 1456. "Because [the ALJ] had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shivley v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). This court will not disturb the ALJ's findings as to credibility unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *See Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974.) In his opinion, the ALJ found that Mullins's allegations of disabling pain and other symptoms were not credible and not supported by the documentary evidence. (R. at 20.) Furthermore, Schacht, who testified at the hearing before the ALJ, noted that there seemed to be possible credibility issues because of Mullins's past substance abuse. (R. at 519.) Although Mullins has denied improper drug use, he has failed several drug screenings, failed to present proper pill counts and was dismissed from pain management. (R. at 321, 329-30, 328, 332.) In addition, Mullins was refused treatment at Stone Mountain Health Services because

-32-

he failed to present past medical records. (R. at 380-85.) Moreover, when Mullins was treated by Dr. Ehtesham, she noted in her medical records that narcotics would not be prescribed. (R. at 432.)

In addition to Mullins's obvious issues with substance abuse, Mullins's testimony also has raised the issue of credibility. At the hearing, Mullins claimed that he had failed three separate grade levels; however, as stated by Schacht, a review of his school records indicate that Mullins only failed one grade level. (R. at 112-17.) Furthermore, Dr. McGuffin, who prepared a PRFC, determined that Mullins's symptoms were only partially credible. (R. at 375.) Schacht also indicated that Mullins was likely malingering during Lanthorn's evaluation, thus, negatively impacting the IQ scores and other diagnoses. In this case, it is evident that the ALJ's credibility determinations as to Mullins are proper, rational and supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Mullins's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:    This 8th day of March, 2007.

-33-

_Ellen M. Williams_

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE